```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3    ---------------------------------------X
                                            :
 4    WOLFSON, et al.,                      :  19-MC-00108 (JGK)
                                            :
 5                          Plaintiffs,     :
                                            :
 6                 v.                        :
                                            :  500 Pearl Street
 7    UBS SECURITIES LLC,                   :  New York, New York
                                            :
 8                          Defendant.      :  May 29, 2019
      ---------------------------------------X
 9
                    TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
10           BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
                    UNITED STATES MAGISTRATE JUDGE
11

12    APPEARANCES:

13    For the Plaintiffs:        JOSHUA CROWELL, ESQ.
                                 GARTH SPENCER, ESQ.
14                               Glancy Prongay & Murray
                                 1925 Century Park East
15                               Los Angeles, California 90067

16                               LAWRENCE EAGEL, ESQ.
                                 Bragar Eagel & Squire
17                               885 Third Avenue
                                 New York, New York 10022
18
                                 CHRISTOPHER KUPKA, ESQ.
19                               Levi & Korsinsky
                                 55 Broadway
20                               New York, New York 10006

21    For the Defendant:         PATRICK SMITH, ESQ.
                                 Katten Muchin & Rosenman
22                               525 W. Monroe Street
                                 Chicago, Illinois 60661
23

24    Court Transcriber:         SHARI RIEMER, CET-805
                                 TypeWrite Word Processing Service
25                               211 N. Milton Road
                                 Saratoga Springs, New York 12866


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

2

1          THE CLERK:  In the matter of Wolfson v. UBS

2    Securities, Docket No. 19-MC-108.

3          Counsel, state your name for the record.

4    Joshua Crowell of Glancy Prongay & Murray representing

5    plaintiffs.

6          MR. EAGEL:  Lawrence Eagel, Bragar Eagel & Squire

7    representing plaintiffs.

8          MR. KUPKA:  Christopher Kupka of Levi & Korsinsky

9    for plaintiffs.

10          MR. SPENCER:  Garth Spencer of Glancy Prongay &

11    Murray for the plaintiffs.

12          MR. SMITH:  Patrick Smith of Katten Muchin Rosenman

13    on behalf of defendant UBS.

14          MS. KOWALSKI:  Karen Kowalski on behalf of the

15    defendant UBS.

16          THE COURT:  Welcome everyone.  You can be seated if

17    you're not speaking.

18          We're here based upon an application to compel

19    production from non party, UBS -- a non party underlying

20    litigation UBS Securities, a party to this proceeding

21    obviously.  I've read your papers but I'll certainly hear from

22    you so I guess we'll start with the applicant.  Mr. -- is it

23    Crowell?

24          MR. CROWELL:  Yes, Your Honor.

25          THE COURT:  Okay.

3

1          MR. CROWELL:  Your Honor, during the relevant

2    period, 2011 to 2014, Schwab routed essentially all of its

3    trades to UBS and the Crago action in the Northern District of

4    California centers on the quality of the execution of these

5    orders.  So UBS is an essential component to this case and

6    what it did with the orders from Schwab that was directed to

7    UBS.

8          UBS paid Schwab hundreds of millions of dollars for

9    the order flow and I think it's safe to assume that UBS made

10   at least that amount in executing these orders from Schwab.

11   And we're here -- plaintiffs are simply asking for $17,000

12   worth of UBS's time in order to get fixed messages for 14

13   trading days which is one trading day for each quarter of the

14   class period.

15         And fixed messages are this internal protocol that

16   documents the events in the life of an order.  So the --

17         THE COURT:  So the other side hasn't really raised

18   this but I'm just curious.  It sounds like you got the data

19   from the worm as to like some 98 percent of it.  Is that

20   right?  It's the remaining nine percent you're missing?

21         MR. CROWELL:  It's for -- depending on the day, 10

22   to 20 percent missing data.  Our -- and it depends on the

23   field because there are various fields that we are looking in

24   the fixed messages and at some point it's -- some fields are

25   more complete than others.

4

1          THE COURT:  Okay.  This is not for me but it might

2     have been for the judge in California.  I'm just wondering if

3     given that you're already working on a sample set anyway why

4     you need to just have 100 percent of the sample set rather

5     than whatever you have and then just extrapolate damages if

6     you're successful based on that.

7          MR. CROWELL:  Well, there are a couple of reasons

8     for that, Your Honor.  We've already scaled back and

9     compromised a great deal to focus on these 14 days.  And it's

10    only one trading day in the entire quarter.  So we want it to

11    be a complete data set.  Two, you want data consistency as

12    opposed to having two sets of data and merging them and that

13    can come up with its various problems.  As we -- as USB seems

14    to acknowledge, the value of the time to obtain the data, this

15    extra data in the fixed messages, isn't out of line at all

16    compared to what they have spent in opposing this motion.

17    What many third parties --

18         THE COURT:  Well, it's apparently not the money

19    since you're willing to pay it.  Apparently it's -- I mean

20    obviously they're arguing relevance and certainly we can talk

21    about that but it's disruption.  Not money.  That's their

22    argument on burden.

23         MR. CROWELL:  It's 160 hours that they have

24    estimated over a period of months, and we have been meeting

25    and conferring on the subpoena for over a year.  So if they

5

1  had told us at the outset -- and they have had -- they

2  acknowledge they have experience extracting fixed messages

3  from backup tape.  So they had told us it will take five to

4  seven months, $17,000.  We would have been more than

5  accommodating.  We have -- just the length of this meet and

6  confer process shows we have really tried to bend over

7  backwards to accommodate and compromise with UBS but they have

8  refused to provide even a single sample of fixed messages even

9  from -- that aren't stored under backup tapes.  So it would be

10  much less costly and much easier and faster --

11        THE COURT:  I was wondering about that and it sort

12  of disappeared from your reply brief.  Maybe it disappeared

13  from their opposition brief too but there was talk about 200

14  existing fixed messages.  Do you know what I'm referring to?

15        MR. CROWELL:  Yes, Your Honor.

16        THE COURT:  So is that going to get us anywhere

17  right now if you got those?  I'm not saying you're not

18  entitled to the other stuff but sometimes I like to do these

19  things in stages.  Is that -- are those going to conceivably

20  tell you anything?

21        MR. CROWELL:  Well, potentially.  I think the

22  problem is that we have been seeking a sample for over a year

23  now and they have refused to provide any.  So I think the time

24  for that kind of testing has elapsed.  They haven't disputed

25  that the fixed messages contained extra data.  They just

6

1   dispute whether it would be helpful for our case and they

2   don't dispute that there are gaps in the worm data.

3        So, Your Honor, I think that providing the 200

4   messages is just going to be another delay tactic.  It's

5   already postponed the litigation in the Cargo action for

6   several months.

7        THE COURT:  Let me hear from the defendants and I'll

8   get back to you.

9        MR. SMITH:  Your Honor, thank you.  Patrick Smith on

10  behalf of the defendants.

11       I would suggest a couple of the points.  As you

12  rightly picked out, this is not about the $17,000.  We would

13  not be here if it was.  It is about the disruption, and while

14  they may dismiss the fact that it's a 160 hours of time that

15  would be one individual dedicating several weeks of time to

16  come up with something that we think is duplicative and overly

17  burdensome.

18       The reason why we did not produce a sample of fixed

19  messages is that in order to produce the sample of relevant

20  fixed messages we would have to restore that data from tapes

21  which would again -- to the extent plaintiffs would have

22  agreed that they would be okay with taking one day of fixed

23  messages we would have been fine with that.  What they have

24  said was there's no -- there's never an offer to --

25       THE COURT:  I thought you were going to use it to

7

1  prove something to them.

2         MR. SMITH:  Well, Your Honor, so what they contend

3  is that the fixed messages contain a recording time stamp.  We

4  have reason to believe that it's possible they do but we don't

5  know from the relevant time period whether it does or does

6  not.  In order to do so we would have to restore --

7         THE COURT:  I understand that but the way you

8  present it you're -- there's not -- if you were just being

9  asked one tape it would have been hardly any burden at all.

10  An hour plus an hour, whatever it is, a few hours.  So you put

11  up the good fight, I understand that, but you may have to pay

12  a price for that.  You could have produced it, at least one

13  tape to demonstrate whatever it is you wanted to demonstrate

14  to them a long time ago with one two-hundredth of the burden

15  that you're now being asked to do.  So I'm just kind of

16  surprised you didn't do it.

17         MR. SMITH:  Your Honor, the reason why we never

18  reached an agreement is because we've never been offered

19  anything less than the full 14 days and I don't believe that

20  one day would have satisfied the plaintiffs.  I believe I they

21  have come back and asked for more.

22         Just one more point on that matter.  Right now

23  we're --

24         THE COURT:  Well, you took your chance.  Go ahead.

25         MR. SMITH:  Okay.  Right now we're at the class

8

1  certification stage and based off what the plaintiffs have

2  already -- and their expert and have already done in another

3  case, they have millions of orders to work with to identify

4  representative sample if they were to prove damages.  What

5  they're doing now is trying to go above and beyond what

6  they've done in previous cases and we expect that it will only

7  lead to them if they do certify the class coming back and

8  asking for more.

9         So what we're trying to do, Your Honor, right now is

10  being unable to find a compromise with the plaintiffs.  What

11  we're trying to do right now, Your Honor, is stop this

12  discovery because it's all really burdensome.  They haven't

13  met their burden to establish that it's even relevant and it's

14  not proportional to the needs of the case at this time.

15         THE COURT:  Okay.  I'm prepared to start ruling

16  unless -- is there anything else on anyone's mind?  I'm going

17  to read your papers but --

18         MR. SMITH:  Your Honor, I think just a few points.

19  UBS is a non party and it has no interest in this litigation

20  despite them claiming that we made money off this.

21         THE COURT:  I'm not putting any stock in that.  So

22  don't worry about that.

23         MR. SMITH:  Okay.  I think the amount of the data

24  that the plaintiffs have requested I do have a demonstrative

25  if you think it would be beneficial just to show you this is

1  more than anything they got from the defendants in this case

2  and it's because of the way the orders are routed through our

3  system.  There could be a fixed message that generates from

4  multiple locations within our system that are all separately

5  stored.  The issue here is that to the extent that they want

6  all fixed messages, and it appears they may have backed off

7  that request in their reply slightly saying they only want

8  internal fixed messages now, it's incredibly burdensome and it

9  requires storing multiple tapes.

10         THE COURT:  210.

11         MR. SMITH:  Potentially yes, Your Honor, across all

12  of the -- potentially more across all of the systems.  This is

13  something that UBS has never done because it has all of the

14  relevant data stored in the warm database.  That's the

15  database they used --

16         THE COURT:  Well, it's not the data -- it doesn't

17  have all the data they need to compare the market at the time

18  of the trades.

19         MR. SMITH:  So, Your Honor, I believe it does.  What

20  they're asking for, it's the recording time stamp is something

21  that's not recorded because it's not part of the order record.

22  There's simply a record of when the fixed log is generated.

23  They have a time stamp for the order, the execution, the

24  route.  They acknowledge they have it for 90 percent of the 33

25  million records we produced.

10

1          THE COURT:  Right.  They need it for the other ten

2    percent.

3          MR. SMITH:  I don't think they need it at this

4    stage, Your Honor.  This is before a class, before a class

5    certification.  As you said at the outset, it is possible for

6    you to rule at this time they have enough information and we

7    can come back after class certification in order to decide

8    whether they actually need that after they established class

9    certification.  FINRA, the SEC --

10          THE COURT:  You didn't really make that argument in

11   your briefing that somehow we should put this off, that you

12   were to put this off until after class cert but that they have

13   enough for class certification as opposed to damages.

14          MR. SMITH:  Your Honor, I could point you to the

15   location.  It may have been missed by -- it may not have

16   been --

17          THE COURT:  Maybe I didn't notice it.  I mean it

18   just seems to put -- I didn't think to even ask them that

19   question.  So that your theory is whatever sample they have is

20   enough to get class certification.

21          MR. SMITH:  Yes.  Your Honor, so in another case,

22   same plaintiff's counsel --

23          THE COURT:  Hold on a second.  I just want to ask

24   them about that.

25          MR. SMITH:  Sure.

1          THE COURT:  Does this go to class certification or

2   damages or both or what?

3          MR. CROWELL:  Both, Your Honor.

4          THE COURT:  Why class certification?

5          MR. CROWELL:  Because we need to show a damages

6   model for the whole class.  So --

7          THE COURT:  A damages model.

8          MR. CROWELL:  For the whole class, yes.  Basically

9   we need to be able to show that we can establish economic harm

10  on a class wide basis and that is why we're --

11         THE COURT:  But you would think that the -- whatever

12  these records are that are missing that you -- an order of

13  execution, time stamps, that that's going to affect whether

14  you can show typicality and numerosity and all that.  Will it?

15         MR. CROWELL:  No, it would be predominance, Your

16  Honor.

17         THE COURT:  Predominance.

18         MR. CROWELL:  It would go towards predominance, yes.

19  So in a lot of securities cases there's this need to establish

20  a class wide of damages and your typical stock drop case

21  that's pretty straightforward.  Here, it's a more -- it's a

22  different approach because it's a different sort of case.

23  It's not a regular stock drop case and we need more data for

24  that.

25         Your Honor, they could have as you pointed out

12

1  extracted one backup tape, showed us the data and said you

2  know what, you're wrong.  You're barking up the wrong tree, go

3  away, and there would be nothing we could do about that.

4  Instead they have stonewalled us.  They have --

5           THE COURT:  Wait, wait, wait.  He was in the middle

6  of his thing.  I just wanted an answer to this question of why

7  it was necessary for class certification.  Let me let you

8  finish.  Go ahead.

9           MR. SMITH:  Your Honor, in another case with the

10  same expert and the same -- some of the same plaintiff's

11  counsel which is Klein v. TD Ameritrade, based off the Klein

12  case they relied on ten files and orders to satisfy that they

13  had met -- they could certify the class.  Here they have 500

14  times that amount and yet they're asking for more.  They could

15  get the merits discovery --

16           THE COURT:  [Inaudible] numbers over the issue but

17  go ahead.  That's not a way to compare cases but all right.

18  Go ahead.

19           MR. SMITH:  Understand, Your Honor.  The idea is

20  that or the point is that they don't actually need to

21  calculate the amount of individual damages at this stage.

22  That would be required --

23           THE COURT:  Well, they're not saying they need to

24  calculate the damages.  They say they need a damages model and

25  they have to have a complete data for it.

1          MR. CROWELL:  Your Honor, if I may explain.

2          THE COURT:  I'm sorry.  No, no, no.  Let me let him

3     finish and then I'll hear from you.

4          MR. CROWELL:  Yes, Your Honor.

5          MR. SMITH:  Your Honor, there's a case we cited in

6     our motion Vigaffi v. Solo Management Corp. and it states that

7     proportionality focuses on the marginal utility of the

8     discovery sought.  Here, with the millions of orders we've

9     already produced and the marginal at best relevance of the

10    additional amount of orders particularly at this stage of

11    litigation, particularly in light of the burden that would be

12    faced by UBS with no guarantee that they're not going to come

13    back and ask us to restore more tapes at a later date.

14         Let me just give you one example, Your Honor.  If we

15    restored a tape and it covered more than one day and they came

16    back and let's say they wanted all of the tapes, all of the

17    data for a certain period of time that covers multiple days,

18    all of the fixed logs.  It could be redundant having to

19    restore tapes for a second time later on during the merits --

20         THE COURT:  Oh, that there may be -- I can't worry

21    about discovery.  You preserve any arguments you may have if

22    there's a second request.  I can't worry about that now.  I

23    have to look at this request.

24         MR. SMITH:  I understand, Your Honor.

25         THE COURT:  Keep going.

14

1          MR. SMITH:  The marginal utility of producing the

2     fixed logs in light of the burden is negligible and it's not -

3     - I do not think that the plaintiffs here have met their

4     burden to establish that it's relevant.  They haven't, for

5     example, identified what is missing in the data we've already

6     produced where the --

7          THE COURT:  They say there's missing time entries.

8          MR. SMITH:  Across 33 million entries though, Your

9     Honor.  There's -- these fixed logs and these mili second type

10    stamps come from multiple locations inside UBS.  They have an

11    expert.  They have the ability to identify the gaps to narrow

12    the focus of their request and they haven't done so.  So by

13    asking for everything or nothing it puts us in a tough spot

14    and without an expert as a non party the burden on UBS here is

15    severe.

16         THE COURT:  Okay.

17         MR. CROWELL:  Your Honor, we wanted to litigate this

18    motion to compel in San Francisco before the judge who is

19    presiding over the Cargo action.  UBS did not consent to that.

20    So now they're asking you to try to anticipate what Judge

21    Seeborg in San Francisco will want to see or find valuable at

22    some future date based on a case pending in Nebraska that is

23    highly distinguishable because first of all it doesn't include

24    this order routing kind of arrangement where the broker is

25    routing it to some other destination.

1        You have a different judge obviously, different

2   parties making different arguments, and certainly in TD

3   Ameritrade and I'm sure Schwab will make the same arguments

4   about the depth of the analysis completeness of the analysis

5   and the data.  And we're just trying to -- we've already

6   scaled back our request to 14 trading days and we think that

7   is highly reasonable and we are -- we have sought it every

8   step of this meet and confer to accommodate UBS.  And they

9   have not even giving us information or a sample that will

10  allow us to mitigate or to compromise.

11        So we can't compromise when we're flying blind and

12  we don't have adequate information to do so.  This is really a

13  product of UBS's failure to really engage with us on this

14  issue instead of being intransigent and obstructing us at

15  every direction.

16        THE COURT:  All right.  We're going to -- this is

17  what we're going to do.  First of all, I'm finding that it's

18  relevant for purposes of Rule 26 discovery.  That's obviously

19  not the end of the matter but just so it's clear -- I mean I

20  have an expert telling me that this material is going to be

21  relevant, why it's going to be relevant.  There was a reply

22  declaration that addressed the argument that the defendants

23  made regarding the lag time problem that's not unrebutted by

24  any expert.  So that's not something for further discussion,

25  at least today.

16

1        So now we've come to burden and proportionality

2   which to me are of one piece.  I have to just assess the

3   burden on UBS.  So what I want to do is give UBS and you one

4   chance to make sure that this is -- two things.  One, to make

5   sure that this is going to be valuable data, and two, for

6   there to be a real assessment from UBS about what doing this

7   project would entail rather than one based upon an estimate by

8   an individual who hasn't actually done the specific thing that

9   he's being asked to do.

10       So I think what I want you to do is pick -- I guess

11  pick one day to start and I guess it's somewhere going to be

12  up to 20 tapes?  What is it per day?

13       MR. SMITH:  Well, Your Honor, if it's -- if the

14  plaintiffs want only the internal fixed messages, which is

15  what they said --

16       THE COURT:  Yes.  Is there some that you're willing

17  to settle for internal as opposed to some other type?

18       MR. CROWELL:  If we get more information from UBS we

19  are willing to consider any serious compromise.

20       THE COURT:  So is it easier for him to extract the

21  fixed ones -- I'm sorry.  The internal ones.

22       MR. SMITH:  It's just -- it lowers the number of

23  tapes if there are only the internal messages.

24       THE COURT:  Good.  So how many tapes for a

25  particular day if it's just internal?  Is it just one?

17

1          MR. SMITH:  No, it would be -- so we could certainly

2  give them one location -- Your Honor, may I present you with a

3  demonstrative showing -- it will help for this discussion.

4          THE COURT:  Sure.

5          MR. SMITH:  May I approach?

6          THE COURT:  Yes, you may approach.  I assume the

7  other side has this.

8          MR. SMITH:  Yes.

9                      [Pause in proceedings.]

10          MR. SMITH:  Your Honor, as you see here this is --

11  and this is a very high level demonstrative but --

12          THE COURT:  Does high level mean that I have no way

13  of understanding without an explanation?

14          MR. SMITH:  No, you'll understand it, Your Honor.

15  It's just -- it's simplified dramatically.  The first box

16  there is the entry point for all Schwab orders and it would be

17  the exit point for all Schwab orders.  It most likely would be

18  in the A4 or the RH.  There's two different routes in but that

19  -- if we restored that -- tapes from that location it would

20  give them all executions and all order the fix locks.

21          Now, not all orders as you'll see make it into the

22  UBS ATS.  Not all orders even make it into the smart order

23  router.  So once you start getting down internally there's

24  less and less orders that would be -- that will hit there.  So

25  it's not going to guarantee that you're getting all the orders

18

1  from the smart router, certainly not going to get all the

2  orders in the UBS ATS and then identifying the relevant

3  messages becomes more burdensome on us.

4        THE COURT:  I have to tell you whatever it is you

5  just said I have no idea what you're talking about.

6        MR. SMITH:  Your Honor --

7        THE COURT:  Let me give you the big picture from my

8  point of view.  I was ready today to have you do the whole

9  project which I know you don't want to do and I certainly

10  don't want to put a burden on you but I don't feel that your

11  client has been sufficiently -- has made a sufficient effort

12  to try to figure another way to do this.  So if you think you

13  can produce tapes on a quick basis, like a week, that will

14  convince them or that will give you the ammunition to convince

15  me that you should do some smaller subset of this or very

16  unlikely zero subset of this.  I'm ready to spend a week to

17  give you that opportunity.

18        So I was about to say produce a day and then you

19  said what can we do internal and I said well, how many tapes

20  is that.  I'm just thinking in terms of whoever it is is

21  working overtime for whatever day to try to limit that if that

22  truly is a burden.  So that's my big picture is I want to give

23  you a chance to do that and then after you do that if you two

24  still aren't satisfied I'm probably going to call in your

25  person as a witness to see -- to satisfy myself about what the

1  real burden is here and a human -- and business level because

2  there's a lot of kind of estimates in the affidavit right now

3  and I don't know what it really means, for example, to do ten

4  tapes at a time instead of three tapes at a time and why

5  that's such a big deal and to use more than one server.  All

6  of that has to be part of a discussion between you and the

7  other side and I would strongly encourage you to make the

8  person with knowledge available to them because they may

9  ultimately have to testify here in front of me.  So that's my

10 big picture.

11          If you think that you two can work it out in the

12 next week so that something happens in the next week then I

13 don't have to give you any more detail than that.  If you

14 think you need me to order something I can try ordering it now

15 but it's not -- I don't want to order the whole thing right

16 now.  So this is really a question for the plaintiff's side.

17          MR. CROWELL:  Well, Your Honor, we have waited a

18 while.  We're willing to wait another week and engage --

19          THE COURT:  I'm not asking if you're willing because

20 that I am ordering.  The part that I'd rather not try to do

21 the granular detail on is what exactly I'm ordering to occur

22 in the next week but they have an incentive to do a lot

23 because if they don't satisfy me and you they're going to have

24 to do all 210 or whatever it is.  So my question to you is do

25 you think you need me to order something specific like a

20

```
1   specific day or a specific number of tapes or external or
2   internal or whatever it is or do you think that's something
3   that talking right now right here in this courtroom or in my
4   jury room without me being involved you could figure out?
5              MR. CROWELL:  I don't want to burden the court with
6   that.  I think we can work productively toward that goal.
7              THE COURT:  Do you understand what I'm talking about
8   here?
9              MR. SMITH:  I do, Your Honor.  Could I ask one --
10  make one comment?
11             THE COURT:  Sure.
12             MR. SMITH:  The only delay I want to make the court
13  aware of would be retrieving tapes from storage which we -- I
14  think we've talked about the process and we'll start that
15  today.
16             THE COURT:  Okay.
17             MR. SMITH:  But that process could take more than a
18  week.  Just --
19             THE COURT:  Just the --
20             MR. SMITH:  Just getting the tapes from storage
21  because they might not be onsite.  So why don't we -- I can
22  give an estimate to the plaintiffs after this but --
23             THE COURT:  Hold on.  Just give me a second.  I just
24  want to read your guy's affidavit on that topic.
25             MR. SMITH:  Sure.
```

21

 1                    [Pause in proceedings.]

 2              THE COURT:  I don't think I --

 3              MR. SMITH:  I think it takes --

 4              THE COURT:  -- can find that part.  Where is that?

 5              MR. SMITH:  Point 7.

 6              THE COURT:  Two weeks to retrieve a single backup

 7    tape.

 8              MR. SMITH:  Point 7, yeah.

 9              THE COURT:  Okay.  I assume that burden -- the

10    burden of retrieval is zero so -- or relatively zero.

11              MR. SMITH:  Relatively zero, yes.

12              THE COURT:  So I think you should retrieve them all

13    now so you're ready to go, or at least like a good number

14    because I don't want that to be a delay but once you do that -

15    - oh, then he -- well, he has to lose two days testing and

16    designing a script but that's when -- but then after that is

17    when the lengthy period comes.  So I'm sorry about the two

18    days but we have to go down that road.

19              I'm willing to try sparing you on this five to seven

20    month period.  If you either convince the other side or

21    failing that knew that that truly is going to be burdensome --

22    I mean I might have you do it anyway but I also might have you

23    do it on a quicker timetable if I'm not convinced that it's

24    real -- if I'm convinced that it's proportional to the case to

25    actually produce the data and I have to also consider how much

22

1  time I'm going to allow you and what the burden is going to be

2  to do that process.

3        So I guess there's sort of two things going on.  One

4  is it may be that by doing this with a tape you can somehow

5  narrow whether you have to do all 210 tapes and the other part

6  of this is do you -- I'll give you an opportunity if you two

7  aren't able to agree to it there's going to have to be some

8  discussion about how quickly you have to do this if I'm

9  ordering all of it.  Have I been sufficiently opaque?

10       Is there anything else you think we should be

11  talking about today from the plaintiff's side?

12       MR. CROWELL:  No, Your Honor.

13       THE COURT:  Anything from your side?

14       MR. SMITH:  No, Your Honor.

15       THE COURT:  So you want to sit in the courtroom?  I

16  can send my clerk down now to lock up but if you think you're

17  going to want to spend a little time I can tell her to wait a

18  little, or you're not going to do it here?

19       MR. CROWELL:  Well, we're prepared to speak but I'm

20  not sure if Mr. Smith is in a position to do so.

21       MR. SMITH:  We'll get started right away, Your

22  Honor.

23       THE COURT:  You'll get started.  So I'm going to

24  turn off our taping system.  I'll leave the courtroom and I'll

25  send my clerk down in about 15 minutes -- or you know what you

23

1  can do here?  I'm going to give you a way to call us up and

2  let us know when you're done.

3          MR. CROWELL:  Your Honor, we can step out into the

4  hallway.

5          THE COURT:  Okay.

6                    * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

1       I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                       Shari Riemer, CET-805

7   Dated:   May 30, 2019